1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   **DAVID PHOMMACHANH,**              Civil No.    13-0869 MMA (MDD)

12                      **Petitioner,**

13            **vs.**                     **REPORT AND**
                                          **RECOMMENDATION RE:**
14
                                          **(1) DENYING PETITION FOR**
15   **WARDEN F. FOULK,**                 **WRIT OF HABEAS CORPUS;**
                                          **and**
16                      **Respondent.**
                                          **(2) DENYING REQUEST FOR**
17                                        **EVIDENTIARY HEARING**

18

19   **I.    INTRODUCTION**

20          Petitioner David Phommachanh, a state prisoner proceeding pro se with a Petition

21   for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenges his conviction in

22   San Diego County Superior Court Case No. SCD191585 for murder, attempted murder,

23   assault with a semiautomatic firearm, and gang and gun enhancements. (Pet. at 1-2,

24   ECF No. 1.)[1]  The Court has reviewed the Petition, the Answer and Memorandum of

25   Points and Authorities in Support of the Answer, the Traverse, the lodgments, the

26   record, and all the supporting documents submitted by both parties.  For the reasons

27   
     ──────────────
28   [1] Page numbers for docketed materials cited in this Report and Recommendation refer
     to those imprinted by the Court's electronic case filing system.

                                          1

discussed below, the Court recommends the Petition be  **DENIED**.

## II.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal opinion:

> In 2005, [Konrsavanh Donald] Sirypangno and Phommachanh were documented members of the Oriental Killer Boys (OKB) criminal street gang. Sirypangno's gang moniker was "Reckless"; Phommachanh's moniker was "Felon." Other OKB members included Devin Giraud ("Striker") and Steven Joyce ("Turtle").

> On the evening of June 11, 2005, Phommachanh drove his out-of-town cousin, Danny Boualouang, and Judy Rattana to a friend's residence and later to a birthday party for a Cambodian girl. Rattana was Phommachanh's girlfriend and the mother of their daughter. [footnote 3 omitted]. Sirypangno, and Joyce and his girlfriend, Melissa Rasasack, drove to these locations in a separate vehicle. OKB member Giraud also was at the Cambodian girl's party. During that party, Rattana learned some of her girlfriends were going to a party in Mira Mesa and decided to accompany them. Rattana left the Cambodian girl's party with her girlfriends. The plan was for Phommachanh to first pick up their daughter at her grandparent's house, take the girl home, then pick up Rattana at the Mira Mesa party and bring her home.

> Before Phommachanh went to the Mira Mesa party, he received a call on his cell phone. Boualouang heard Phommachanh tell someone to bring a "strap," which is street jargon for gun, because there might be "some problems" at the party.

> At about 11 p.m., Phommachanh, Boualouang and Giraud went to the Mira Mesa party, which was in the backyard of a house at the corner of Lott Point and Santa Arminta Streets. Sirypangno, Joyce and Rasasack went in a separate vehicle.

> Access to the party was through a side gate to the backyard; admission cost $2.00. At first, Phommachanh and the others were not allowed to enter because there were too many people at the party. Phommachanh told the two young men who were manning the gate there would be trouble if he and his friends were not allowed inside. Rattana walked up to the young men at the gate and told them to let Phommachanh and the others in to avoid problems. Phommachanh, Boualouang, Giraud and Rasasack walked into the backyard without paying. Sirypangno and Joyce jumped over the backyard fence.

There were a number of altercations at the party that evening, including at least one before Phommachanh, Sirypangno and the others arrived.  While invited guest Hasib Farhan was standing near a young woman, he accidentally blew cigarette smoke in her face and almost burned her hair.  An argument ensued, and Julie Nguyen, who was with the young woman, threatened to have Farhan jumped by OKB members if he did not apologize.  Nguyen, who is known to her friends as "Mai," is an affiliate of OKB.  After Phommachanh and the others entered the backyard, they were greeted by Mai and the young woman.

At one point, some of the invited guests complained that they were uncomfortable because Phommachanh and his group were "mad-dogging" or staring at people at the party.  [footnote 4 omitted.]  Farhan, who had played football in high school, and some of his friends who also played football approached Phommachanh and Sirypangno, who were standing next to each other, and told them to calm down or they would have to leave.  Sirypangno pulled up his shirt, removed a black semiautomatic gun from his waistband, racked a round and pointed the gun at Farhan.  Although Farhan did not hear Sirypangno say "OKB" or "this is OKB" and did not see Phommachanh flash gang signs, others who were present testified they did.  Once the gun was displayed, Farhan's friends pushed him back into the house.  Sirypangno and Phommachanh jumped over the back fence and onto a sidewalk.  In the process, they knocked out one of the wood planks of the fence.

One of the party hosts, Natasha Richardson, who had gone outside with Farhan, approached Mai, tapped her on the shoulder and asked Mai to have Sirypangno put the gun away.  Mai told Richardson not to touch her, yelled "OKB" and punched Richardson in the face.

After Sirypangno and Phommachanh jumped the fence, Sirypangno stayed on the sidewalk behind the backyard of the party house, but Phommachanh did not.  Sirypangno became angry when he overheard portions of a conversation between Tylor Thompson [the victim in the murder count] and Jeremy Waller, who were standing near the fence.  Waller and Thompson were talking about a group of girls who had earlier been fighting and wondered where "the bitches" had gone.  From the other side of the fence, Sirypangno said: "Who you guys calling a bitch?"  According to Waller's testimony, he and Thompson replied they were not talking about Sirypangno, they did not know him and they did not call him a bitch.  Sirypangno threw a piece of wood over the fence at Waller and Thompson.  When Waller and Thompson looked over the fence, Sirypangno pulled up his shirt and displayed the gun in his waistband.

Kelly Anderson [the victim in the attempted murder count] who also was a friend of Thompson, gave a slightly different version of the over-the-fence exchange between Thompson and Sirypangno.  Anderson testified that Sirypangno said: "What the fuck did you say?"  Thompson replied: "I don't know what you're talking about, I don't even know you, you're tripping" and "I don't know who the fuck you are."  Sirypangno said: "You fucking said something, what the fuck did you say, don't be a pussy."  Thompson responded: "Fuck you, suck my dick."  Anderson testified Sirypangno then said he would catch Thompson outside and threw a piece of wood at them.  [FN 7.]  After the exchange, Anderson, Thompson, his girlfriend Krystal Abiva, and Brandon Guaderrama, who

3

went to the party with Thompson, remained in the backyard for between 15 and 20 minutes before leaving to allow tempers to calm down.

> [FN 7:]   Alexander Noble, a long-time friend of Phommachanh, provided another version of the Sirypangno-Thompson exchange.  Noble, who is not a gang member, testified that Thompson said something to the effect that "these guys are not real gangsters[;] they're just bitches." Upon hearing this, Sirypangno responded by saying: "I'm a real fucking gangster[;] you'll see when you get out."

Meanwhile, Phommachanh, Rattana and Boualouang decided to leave the party and go home.  As the trio started walking to the car, Giraud called out Phommachanh's name and asked him to return.  Phommachanh and Boualouang walked back to see what Giraud wanted while Rattana continued walking to the car.  A visibly upset Sirypangno then approached Phommachanh and told him about his exchange with Thompson. According to Boualouang, Phommachanh told Sirypangno not to worry about it and tried to calm him down.   While Sirypangno and Phommachanh were talking, Rattana drove up to the house.   As Phommachanh stepped into the passenger seat, Sirypangno handed him the gun.  When Rattana asked Phommachanh about the gun, he replied he was just holding it.  Phommachanh then put the gun in the glove compartment. Rattana drove away and headed home.

Within five minutes, Phommachanh received a cell phone call to come back and pick up Sirypangno.  When they returned, Phommachanh put a bandanna over his face, removed the gun from the glove compartment and stepped out of the car.  Phommachanh waved the gun and shouted "who wants it"; he then joined Sirypangno, Joyce and Giraud who were lined up in front of the house waiting for Thompson to emerge from the backyard.  When Thompson came out, Sirypangno approached him, said "you the fool that fucking told me to suck your dick," and punched or tried to punch him in the face.  Guaderrama then tackled Sirypangno and Joyce joined the fight as well.  Anderson tried to get Thompson to stop fighting and pull him away.

Phommachanh pointed the gun at Thompson, who put his hands up and said "no."  When the gun did not fire, Phommachanh cleared an unfired round from the chamber by racking back the slide of the gun.  He then fired five shots, striking both Thompson and Anderson.  Thompson and Anderson struggled to get up and run away, but collapsed.

Phommachanh, Sirypangno, Joyce and Boualouang got into the car and Rattana drove away.  The group discovered Joyce had been shot in the foot.  Phommachanh gave the gun to Sirypangno, who told Rattana to drive to Giraud's house because they needed to hide "the strap."  Rattana dropped off Phommachanh and Sirypangno at Giraud's house, where the gun was hidden in a rice bin. [FN 8.] Rattana then drove home with Joyce and Boualouang.  Phommachanh phoned Rattana and told her to get rid of Boualouang's clothes, which had blood on it from Joyce's wound.  When Phommachanh returned home, he tried to clean the blood from his car.  He also told Rattana and Boualouang to say he was at home that night if anyone asked.  Phommachanh also phoned Noble (see fn. 7 *ante*), who had witnessed the shooting, and told him not to tell anyone what had

happened.

> [FN 8:] During a search of Giraud's residence, police located the firearm, which was a .45 caliber semiautomatic handgun. Ballistic tests showed the gun fired the shell casings that were found at the crime scene. Testing of the DNA collected from the gun was a mixture of three possible DNA contributors: Phommachanh, Sirypangno and a third person.

> Thompson bled to death. He had two gunshot wounds to left side of his body that could have been caused by the same bullet. One wound was to the left arm; the other wound was to his left flank. The bullet that entered the left flank severed the iliac artery and vein.

> Anderson had gunshot wounds to her abdomen and right hip. Anderson had surgery to remove her appendix, which had burst, and half of her colon. She was in the hospital for five days.

> Detective Daniel Hatfield of the San Diego Police Department's gang unit testified that at the time of the shooting, OKB was an Asian criminal street gang with 106 documented gang members. Hatfield said OKB engaged in a pattern of criminal gang activity and gang's primary activity were serious assaults, burglaries, automobile thefts and murders.

> Hatfield also discussed gangs in general and explained that reputation and respect are of utmost importance to gangs because they enable a gang to instill fear among rival gangs and people who live in the community. People who live in the community often are reluctant to testify against gang members because they fear retaliation from the gang. Gang members gain respect by committing violent crimes and by backing up their fellow gang members in fights.

> Hatfield also testified that disrespect to a gang member is considered disrespect to the entire gang. Such disrespect can take many forms, including a person looking at a gang member in the "wrong way." Gang fights easily escalate into violence. When gang members are involved in crimes, including murder, the gang's reputation for violence increases and the community's fear of and intimidation by the gang increases.

(Lodgment No. 12 at 3-10.)

## III.   PROCEDURAL BACKGROUND

On October 14, 2008, the San Diego County District Attorney's Office filed a fifth amended information charging David Phommachanh with one count of murder (count one), one count of attempted murder (count two), and one count of assault with a semiautomatic firearm (count three). (Lodgment No. 1, vol. 2 at 0483-85.) As to counts one and two, the information also alleged that Phommachanh intentionally and

personally discharged a firearm, within the meaning of California Penal Code (Penal Code) section 12022.53(d).  (*Id.*)  As to counts one, two and three, the information alleged Phommachanh committed the crimes at the direction of, or in association with a criminal street gang and with the specific intent to promote, further and assist in criminal conduct by the gang, within the meaning of Penal Code § 186.22(b)(1).  (*Id.*)  As to counts two and three, the information alleged that Phommachanh personally inflicted great bodily injury on Kelly Anderson, within the meaning of Penal Code § 12022.7(a), and as to count three, the information alleged Phommachanh personally used a firearm, within the meaning of Penal Code section 12022.5(a).  (*Id.*)

Following a jury trial, a jury found Phommachanh guilty of all counts and found all the allegations true.  (Lodgment No. 35, vol. 32 at 5703-06.)  Phommachanh was sentenced to seventy-five years-to-life in prison plus seven years.  (Lodgment No. 5, vol. 32 at 5742.)

Phommachanh appealed his conviction and sentence to the California Court of Appeal, Fourth Appellate District, Division One.  (Lodgment Nos. 7-9.)  The state appellate court affirmed the convictions in an unpublished written opinion.  (Lodgment No. 12.)[2]  That court also later denied a Petition for Rehearing.  (Lodgment No. 14.)

Phommachanh then filed a Petition for Review in the California Supreme Court, which denied the petition stating, "The petition for review is denied without prejudice to any relief to which defendant may be entitled after we decide *People v. Favor*, S189317."  (Lodgment No. 17.)[3]

---

[2] The court of appeal corrected Phommachanh's sentence, an issue not relevant to his challenges in this Court.

[3] *People v. Favor*, 54 Cal. 4th 868, 880 (2012) held that "[u]nder the natural and probable consequences doctrine, there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense.  It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation."  Because Phommachanh was the shooter, *Favor* is of no relevance here.

Phommachanh then filed a Petition for Writ of Habeas corpus pursuant to 28 U.S.C. § 2254 in this Court on April 10, 2013 [ECF No. 1]. Respondent filed an Answer and Memorandum in Support of the Answer on July 24, 2013 [ECF No. 9]. Phommachanh filed a Traverse on November 13, 2013 [ECF No. 29].

## IV.   DISCUSSION

Phommachanh raises five claims in his Petition. First, he claims he was denied his federal constitutional right to a jury drawn from a cross-section of the community. Second, he argues the admission of his gang moniker "Felon" and rap lyrics found at his home violated his federal due process right to a fair trial. Third, he contends the failure to instruct the jury on the defense of provocation violated his right to have the jury instructed on the theory of his defense. Fourth, Phommachanh claims there was insufficient evidence presented that the crimes were committed for the benefit of a street gang and with the intent to promote, further, or assist a gang. Fifth, Phommachanh argues the cumulative effect of the errors that occurred at his trial rendered his trial unfair, in violation of his due process rights. By Order dated August 16, 2013, Phommachanh's fifth claim was voluntarily dismissed as unexhausted. (*See* Order dated Aug. 16, 2013, ECF No. 16.) Respondent argues the state court's resolution of claims one through four was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 7-18, ECF No. 9.)

### 1.  *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court

13cv0869

proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court

decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*  Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

   2. *Whether the Jury Represented a Fair Cross Section of the Community (claim one)*

   In his first claim, Phommachanh challenges the composition of the jury on grounds that it was not drawn from a fair cross-section of the community.  (Pet. at 14-20, ECF No. 1; Traverse at 10-13, ECF No. 29.)  Respondent counters that the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 12-17, ECF No. 9.)

   Phommachanh raised this claim in the petition for review he filed in the California Supreme Court.  (Lodgment No. 16.)  That court denied the petition without prejudice to any relief Phommachanh would be entitled to under *People v. Favor*, as noted above.  (Lodgment No. 17.)  Thus, this Court must "look through" to the state appellate court's opinion as the basis for its analysis under AEDPA.  *Ylst*, 501 U.S. at 805-06.  The jury composition challenge was the subject of extensive pre-trial litigation, which is aptly summarized by the state appellate court.  That court, applying clearly established Supreme Court law, wrote as follows:

> In January 2008, counsel for Brown (see fn. 15, *ante*) filed a challenge to the jury venire; he claimed Hispanics were being excluded in the central district (downtown) venire.  Phommachanh and Sirypangno filed a motion to join Brown's challenge, which was granted.
>
> [FN 15:] The discovery aspects of Phommachanh's challenge to the jury venire were before us in *Roddy v. Superior Court* (2007) 151 Cal.App.4th 1115, 1120.  Phommachanh and Sirypangno, along with Mark Brown, a defendant in a separate criminal proceeding, sought enforcement of subpoenas duces tecum on the jury commissioner to disclose Department of Motor Vehicles (DMV) records used to compile the jury summons lists.  After the trial court had

ordered enforcement of the subpoenas duces tecum, the jury commissioner petitioned for a writ of mandate challenging the order. (*Ibid.*) We granted the petition, finding among other things, that Brown, Phommachanh and Sirypangno had not shown the DMV information subject to the subpoenas was relevant to proving their claim of minority underrepresentation because of systematic exclusion. (*Id.* at pp. 1137-1143.)

In May and June 2008, before trial commenced, the trial court in Brown's case conducted an extensive hearing on Brown's claim that Hispanics were underrepresented in the jury venire for the downtown San Diego courthouse, in which he was being tried. [FN17.] The downtown central district has about 45 percent of the county's population, but a disproportionate number of jury trials are held in the central district's courtrooms. For example, in 2007, the central district used 998 jury panels, the North County district used 330 jury panels, the East County district used 326 jury panels and the South Bay district used 83 panels. [FN18.]

[FN17:] San Diego County Superior Court consists of four judicial districts — downtown central, North County, East County and South Bay — which coincide with the county's former municipal court districts before court unification.

[FN18:] Because of the small number of jury trials in the South Bay district, the jury commissioner's office allows prospective jurors to call in to see if they are needed.

In 2007, the jury commissioner's office adopted a 70/30 draw for the central district, which provided that 70 percent of prospective jurors summoned for jury service in the central district were residents of the district and the remaining 30 percent were residents of the three other judicial districts. (See fn. 17, *ante*.) [FN19.] The purpose of the 70/30 draw was to provide all eligible prospective jurors in San Diego County an equal opportunity to be summoned for jury service and to factor in the much higher workload — or need for jurors — in the central district, with its approximately 1,000 annual jury trials. The 70/30 draw was based entirely on population distribution numbers and workload demands; it was not based on race considerations.

[FN19:] Previously, the jury commissioner's office used an 87/13 draw for the central judicial district.

Also in 2007, the jury commissioner's office adopted written policies to standardize the granting of excusals from jury service for medical, financial hardship and language difficulty reasons. The goal was to ensure excusals were legitimately approved.

Brown's demographics expert, John Weeks, a professor of geography and the director of the international population center at San Diego State University, testified that about 19 ½ percent of the county's Hispanic population is eligible to serve as jurors, according to census data. In the central district, the figure is 14.99 percent. Using data from a survey conducted in early 2007 before the jury commissioner adopted

the 70/30 draw (see fn. 19, *ante*), Weeks testified that 9.4 percent of the people showing up for jury service in the central district were Hispanic, which constituted a 9.6 percent absolute disparity and a disparity of 50 percent underrepresentation when compared to the countywide figure for the jury eligible Hispanic population.

Weeks testified that the disproportionate 70/30 draw for the central district did not give everyone in the county an equal opportunity to serve and that the boundaries of the judicial districts would have to be changed to accomplish such equality.  Weeks also testified that the systematic exclusion of Hispanics was caused by the jury commissioner's lax and inconsistent policies for granting excusals from jury service — particularly those granted for lack of English proficiency — and the high number of failures to appear in the South Bay judicial district, which has the county's highest percentage of Hispanics.

Weeks opined that systematic methods used in the county were responsible for the lower percentage of Hispanics in the jury venire for the central district. Weeks also said the 70/30 draw made the situation worse.

The prosecution's expert, Michael Sullivan, who operates a consulting firm that specializes in statistical analysis, testified Hispanics make up 19.59 percent of the county's population who are eligible to serve on a jury.  Sullivan further testified that under the current 70/30 draw, Hispanics made up 17.83 percent of the potential jurors summoned to the central judicial district.  This amounts to a 1.76 percent (19.59% – 17.83%) absolute disparity when compared to the percentage of Hispanics in the countywide population, which was a lower percentage than under 87/13 split.  Sullivan testified the reason a disparity exists under the split draw system is that the county's Hispanic population is concentrated in the South Bay and North County districts.

The trial court found Brown failed to make a prima facie case under *Duren*, *supra*, 439 U.S. 357.  The court acknowledged that the first *Duren* criterion was satisfied — Hispanics were a cognizable group.  (*People v. Sanders* (1990) 51 Cal.3d 471, 491 [Hispanics constitute a distinctive group in community within meaning of first requirement for *Duren* prima facie case].)

However, the court ruled Brown had not met the second and third *Duren* requirements. As to the second *Duren* requirement, the court found the disparity of Hispanics in the central judicial district compared to the countywide Hispanic population was not constitutionally significant under both Week's analysis and Sullivan's analysis.  As to the third *Duren* requirement, the trial court found that Brown had not demonstrated that any underrepresentation was caused by systematic exclusion of Hispanics in the jury selection process.

The trial court stated it did not put a lot of weight behind the statistical evidence presented by expert Weeks because (1) it was largely based on the 2007 survey, which took place over a relatively short period (four weeks), and (2) changes implemented by the jury commissioner's office since the survey was conducted most likely reduced any disparity.

In sum, the trial court found the jury selection process was race

13cv0869

neutral and that the representation of Hispanics in the venire was fair and reasonable in relation to the number of Hispanics in the county.

### 3. *Analysis*

Regarding the second *Duren* requirement, we note Weeks opined that there was an absolute disparity of 9.6 percent while Sullivan opined there was an absolute disparity of 1.76 percent. The trial court found both numbers were constitutionally insignificant. Although there have been cases that have held a disparity of less than 10 percent is not constitutionally significant (see e.g., *Swain v. Alabama* (1965) 380 US. 202, 208–209; overruled on another ground in *Batson v. Kentucky* (1986) 476 U.S. 79, 100, fn. 25 [10 percent disparity deemed inadequate], it is difficult to identify a threshold of disparity sufficient to be deemed constitutionally significant under the second *Duren* requirement. (*Bell, supra*, 49 Cal.3d at p. 528, fn. 15.) But certainly, the 1.76 percent disparity figure supplied by Sullivan was constitutionally insignificant. (*Ibid.*) At any rate, we do not have to decide the issue here because the trial court ruled Brown failed to establish a prima facie case under the third *Duren* requirement. (*People v. Burgener* (2003) 29 Cal.4th 833, 857.)

To meet the burden to show that underrepresentation was the result of systematic exclusion — the third element of the *Duren* test — a defendant must establish more than statistical evidence of a disparity. A defendant also must show that the disparity is the result of an improper feature of the jury selection process. (*Bell, supra*, 49 Cal.3d at p. 530.) If a county's jury selection criteria are neutral to race, the defendant must identify some aspect of the manner in which the selection criteria are applied that is constitutionally impermissible. (*Id.* at p. 524.)

Contrary to Phommachanh's appellate contention, the record supports the court's conclusion — namely, whatever the underrepresentation of Hispanics was in the central judicial district venire, it was not caused by systematic exclusion of Hispanics in the jury selection process. Substantial evidence supports the trial court's finding that Weeks's analysis, based on the 2007 survey, deserved little weight. Substantial evidence also supported the court's findings that (1) changes in the jury selection process made after the 2007 survey have likely reduced the disparity of Hispanics in the central judicial district venire and (2) these changes were implemented to provide all eligible prospective jurors in San Diego County with an equal opportunity to be summoned for jury service and to balance the workloads of the judicial districts. The trial court's conclusion that the jury selection process in the county was race neutral was supported by substantial evidence.

(Lodgment No. 12 at 34-41.)

As the state court noted, under clearly established Supreme Court law, to establish a prima facie violation of his Sixth Amendment right to a jury drawn from a cross section of the community, a defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community;

12

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Randolph v. People of the State of California*, 380 F.3d 1133, 1140 (9th Cir. 2004) citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

The Court agrees with the state court that it is undisputed Hispanics are a distinctive group in the community, and thus the state court was correct in concluding the first *Duren* prong was satisfied. As to *Duren*'s second prong, neither the Ninth Circuit nor the Supreme Court mandates that a specific test that must be used to determine whether a group is underrepresented in a jury pool. *See United States v. Hernandez-Estrada*, __ F.3d __, 2014 WL 1687855 (9th Cir., Apr. 30, 2014). Moreover, in mounting a *Duren* challenge, "the challenging party must establish not only *statistical* significance, but also *legal* significance," which means that "if a statistical analysis shows underrepresentation, but the underrepresentation does not substantially affect the representation of the group in the actual jury pool, then the underrepresentation does not have legal significance in the fair cross-section context." *Id.* at *8.

According to the state appellate court, Weeks testified there was a 9.6% absolute disparity in Hispanic representation and Sullivan testified there was a 1.76% disparity. (Lodgment No. 12 at 40.) After a review of the testimony, the numbers do not appear to be that clear. Weeks did testify there was a 9.6% disparity in Hispanic representation in the juror pool, but that was the difference between the percentage of Hispanics in the county (approximately 19%) and the percentage of Hispanics who show up for jury duty in the Central District (9.4%). (Lodgment No. 5, vol. 10 at 1329-30.) Under cross examination, Weeks admitted that a comparison between the percentage of Hispanics who live countywide (approximately 19%) and the percentage of Hispanics who show up for jury duty county wide (12.2%) leaves a difference of 6.6%. (*Id.* at 1434.) And,

13

a comparison of Hispanics who live in the Central District (15%) and the number of Hispanics who show up for jury duty in the Central District (9.4%) also leaves a disparity of 6.6%. (*Id.*)  The difference between the countywide average of Hispanics jurors (12.2%) and the Central District (9.4%) is 2.8%. (*Id.* at 1434-35.) And, as the state court noted, Weeks's calculations were based on the juror summoning system in place before the 2007 changes. Sullivan's 1.76% Hispanic disparity number came from taking the countywide Hispanic jury-eligible population (19.59%) and subtracting the Hispanic jury-eligible population being summoned to the Central courthouse under the new 70/30 split (17.83%).  (Lodgment No. 5, vol. 11 at 1676-77.)

As the state appellate court noted, it is "difficult to identify a threshold of disparity sufficient to be deemed constitutionally significant under the second *Duren* prong." (Lodgment No. 12 at 40; *see also Randolph*, 380 F.3d at 1140; *Herndanez-Estrada*, 2014 WL 1687855 at *9.)  The state court thus chose to avoid resting its analysis on the second prong because of this ambiguity and instead based its denial of Phommachanh's representative jury claim on his failure to satisfy the third prong of Duren, that any exclusion was the result of a systematic exclusion of Hispanics from the jury pool. (Lodgment No. 12 at 40-41.)  The Ninth Circuit in *Randolph* found that a jury pool selection system like the one used in Phommachanh's case did not meet *Duren*'s third prong.  In that case, the Fresno jury commissioner used the voter registration list and the DMV list to compile its eligible juror pool. *Randolph*, 380 F.3d at 1140.  The Ninth Circuit noted that while "disproportionate exclusion of a distinctive group from the venire need not be intentional to be unconstitutional, . . . it must be systematic." *Id.* at 1141.  The defendant in *Randolph*, like Phommachanh, did not satisfy *Duren*'s third prong because he has not established the underrepresentation of Hispanics is "*inherent* in the particular jury-selection process." *Duren*, 439 U.S. at 366 (emphasis added).

In his Traverse, Phommachanh raises a separate equal protection challenge to San Diego's juror selection process.  (Traverse at 10-13, ECF No. 29.)  "A Traverse is not

the proper pleading to raise additional grounds for relief." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). Additionally, this claim is not exhausted. Nevertheless, this Court may deny the petition if it is "perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).

The Supreme Court has outlined the appropriate analysis for an equal protection claim:

> The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike. *Plyler v. Doe*, 457 U.S. 202, 216 (1982). . . .The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. [citations omitted]. . . .The general rule gives way, however, when a statute classifies by race, alienage, or national origin. These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy — a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. [citations omitted].

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985).

Phommachanh has not shown how he has been treated differently from similarly situated individuals on the basis of race or other suspect classifications. And, he does not have standing to challenge any equal protection violation Hispanic jurors may have suffered. "A successful claim under the Equal Protection Clause . . . requires the governmental actor to have discriminated against *the plaintiff*, in the absence of special circumstances permitting reliance on rights of third parties. *See Powers v. Ohio*, 499 U.S. 400, 410–11 [citations omitted]." *Barnes-Wallace v. City of San Diego*, 704 F.3d 1067, 1085 (9th Cir. 2012) (emphasis added).

Given the above, and the deferential standard this Court must apply under AEDPA, this Court cannot conclude the state court's denial of Phommachanh's jury representation claim was contrary to clearly established Supreme Court law, or an

13cv0869

1    objectively unreasonable application of that law.  *Yarborough*, 540 U.S. at 4; *Williams*,

2    529 U.S. at 412-13.  He is therefore not entitled to relief as to this claim.

3         3.  *Admission of Gang Moniker and Rap Lyrics (claim two)*

4         Phommachanh next claims the trial court improperly admitted evidence that

5    Phommachanh's gang moniker was "Felon" as well as rap lyrics found at his house

6    which detailed OKB gang life and the commission of various crimes.  (Pet. at 21-26,

7    ECF No. 1; Traverse at 14-31, ECF No. 29.)   The admission of this evidence,

8    Phommachanh contends, violated his right to a fair trial because it was impermissible

9    propensity evidence, the only relevance of which was to portray Phommachanh as an

10   individual with a "criminal disposition" who was predisposed to commit criminal acts.

11   (*Id.*)  Respondent counters that because there is no clearly established Supreme Court

12   law which holds that propensity evidence violates due process, the state court's denial

13   of this claim was neither contrary to, nor an unreasonable application of, clearly

14   established Supreme Court law.  (Mem. of P & A. Supp. Answer at 17-19, ECF No. 9.)

15        During the search of Phommachanh's house, police discovered rap lyrics under

16   the mattress of his bed.  The lyrics read as follows:

17        Southeast OKB that's the set that I bang, where real killaz put in work to
          earn respect in the game, ain't no part time bangers, cause we blastin on
18        sight, so if you tryna pull my card, just watch yo ass tonight, the 15 11 02
          gang watching my back, for all yall sneeky [sic] muthafuckaz creeping
19        tryin to attack, got the SK clock'd back one in the chamber, to yall cross
          town duck cause your lifes [sic] in danger, Oriental Killa Boys straight
20        pushing the line, so take a step up to the plate to see just what you'll find,
          it's some hard hitting batters and you ain't the first, victim taken out by
21        Killaz, now you rollin in the hurst.

22   (Lodgment No. 1, vol. 1 at 0155-56.)

23   / / /

24        In addition to the rap lyrics, Detective Daniel Hatfield, a gang expert, testified

25   Phommachanh's gang moniker was "Felon."  (Lodgment No. 5, vol. 26 at 4593.)

26   Hatfield further testified the lyrics found at Phommachanh's house were about gang life.

27   Specifically, the writer belonged to OKB, and that members of OKB committed

28   criminal acts to earn respect for the gang.  (*Id.* at 4596.)  The lyrics also indicated the

writer was declaring he was a "real" gang member, not a "want-to-be," who will shoot people on sight, and if someone annoys him, OKB will be there for him. Hatfield testified that "SK clock'd back one in the chamber," meant the writer had a gun ready to fire, and individuals who he didn't like should "duck" because their lives were in danger. (*Id.* at 4596-01.)

Phommachanh raised his challenge to the admission of this evidence in the petition for review he filed in the California Supreme Court. (Lodgment No. 16.) That court denied the petition without prejudice to any relief Phommachanh would be entitled to under *People v. Favor*, as noted above. (Lodgment No. 17.) Accordingly, this Court must "look through" to the state appellate court's decision denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06. That court wrote:

> We reject Phommachanh's argument that the trial court allowed impermissible bad acts evidence. Evidence of other crimes or misconduct is inadmissible when it is offered to show that a defendant had the criminal disposition or propensity to commit the crimes charged. (Evid. Code, § 1101, subd. (a).) However, evidence of other crimes or misconduct by a defendant is admissible if it "'[tends to] logically, naturally, and by reasonable inference . . . establish any fact material for the people, or to overcome any material matter sought to be proved by the defense[.]'" (*People v. Peete* (1946) 28 Cal.2d 306, 315.) Evidence Code section 1101, subdivision (b) codifies this exception to the general rule of inadmissibility by providing for the admission of such evidence "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than [the defendant's] disposition to commit such [crimes or bad acts]."
>
> "[I]f a person acts similarly in similar situations, it can logically be inferred that he probably harbors the same intent in each instance." (*People v. Denis* (1990) 224 Cal.App.3d 563, 568.) "The least degree of similarity (between the uncharged act and the charged offense) is required to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).) We review the admission of evidence under Evidence Code section 1101, subdivision (b) for an abuse of discretion. (*People v. Daniels* (1991) 52 Cal.3d 815, 856 (*Daniels*); see also *People v. Kipp* (1998) 18 Cal.4th 349, 369 (*Kipp*) [trial court's determination is essentially a determination of relevance that is reviewed for abuse of discretion].) When reviewing the admission of bad act evidence, a court considers: (1) the materiality of the fact to be proved or disproved; (2) the probative value of the bad act evidence; and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. (*Daniels*, *supra*, at p. 856.)
>
> . . . .

17

Intent to kill and premeditation were material to this case. Phommachanh's not guilty plea put in issue all of the elements of the offenses, including intent. (*Daniels*, *supra*, 52 Cal.3d at pp. 857-858.) Criminal intent is seldom proved by direct evidence and often must be inferred from a defendant's conduct. (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1380.) Statements by a defendant frequently are relevant to show intent for the charged crime. (See e.g., *People v. Lang* (1989) 49 Cal.3d 991, 1013 [first-degree murder defendant's habit of carrying a gun and statements he would "waste" who[ever] interfered with him were relevant to his state of mind]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 756-757 [in murder prosecution defendant's threat against victim is relevant to prove intent and a generic threat is admissible to show defendant's homicidal intent where other evidence brings actual victim within scope of threat].)

Gang evidence that is logically relevant to some material issue in the case other than character evidence is admissible if it is not more prejudicial than probative and is not cumulative. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.) Gang evidence should not be admitted where its sole relevance is to show a defendant's criminal disposition or bad character. (*People v. Sanchez* 1997) 58 Cal.App.4th 1435, 1449.) But where there is a gang allegation, gang evidence will usually be admissible.. (See, e.g., *Ferraez*, *supra*, 112 Cal.App.4th at p. 930 ["expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation'].) Moreover, gang evidence is admissible when it "is relevant to an issue of motive or intent." (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518.) The probative value of motive evidence generally exceeds its prejudicial effect because motive typically is the incentive for criminal behavior; therefore, wide latitude is permitted in admitting such evidence. (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550; see also *People v. Martin* (1994) 23 Cal.App.4th 76, 81 [gang activity or membership admissible where "important to the motive . . . even if prejudicial"].)

Appellate courts have found rap lyrics containing gang references to be admissible. (*People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*); *People v. Zepeda* (2008) 167 Cal.App.4th 25, 34-35.) [footnote 24 omitted.] In *Olguin*, at pages 1372 to 1373, the defendant, accompanied by fellow gang members, shot and killed a rival gang member. A codefendant had written rap lyrics, including in part:

> "When I walk out my door I have to pack my fourty-four.
> R.I.P. there [*sic*] a bunch of punks they will get beat were
> [*sic*] number 1." (*Id.* at p. 1372, fn. 3.)

Rejecting the argument that the lyrics were inadmissible character evidence, the Court of Appeal held the rap song lyrics were relevant and admissible as to the codefendant to show "his membership in [the gang], his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing." (*Id.* at p. 1373.)

We conclude Phommachanh's rap lyrics, which declared his readiness and zeal to shoot at anyone who ticked him off, were relevant to show intent and motive for the charged crimes. Because the rap lyrics evidence intent, their admission did not violate the statutory restriction on

1   propensity or character evidence under Evidence Code § 1101, subdivision
2   (a). (*People v. Barnett*, (1998) 17 Cal.4th 1044, 1119.)

3   (Lodgment No. 12 at 44-47.)

4   The state appellate court went on to analyze whether the gang lyrics and gang
5   moniker, although admissible, should nevertheless have been excluded under California
6   Evidence Code § 352 as more prejudicial than probative.[4] (*Id.* at 47-50.) The court
7   concluded the state trial judge did not abuse his discretion under that code section in
8   admitting the evidence. (*Id.*)

9   State evidentiary rulings are not generally subject to federal habeas review.
10   *Estelle v. McGuire*, 502 U.S. 62, 70 (1991). Thus, to the extent Phommachanh contends
11   the evidence was admitted in violation of state law, he is not entitled to relief. *Id.*
12   Improper admission of evidence can rise to the level of a federal due process violation,
13   however, if a petitioner can show the admission rendered the trial "fundamentally
14   unfair." *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996).

15   The state appellate court's determination that the gang lyrics and gang moniker
16   were relevant to prove motive and intent, which were the main issues before the jury,
17   was not fundamentally unfair. As the state court noted, the rap lyrics were relevant
18   evidence of a willingness to commit murder, affiliation with the gang, loyalty to the
19   gang, and motive and intent on the night of the murder. Although the state appellate
20   court did not explicitly address admission of the gang moniker "Felon," that, too, was
21   relevant to and probative of the prosecution's contention that Phommachanh was an
22   active member of OKB and was loyal to the gang. In any event, as Respondent
23   correctly notes, the Ninth Circuit has stated that there is no clearly established Supreme
24   Court law which holds that propensity evidence is inadmissible or violates due process

25

26   [4] California Evidence Code § 352 states as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Cal. Evid. Code § 352 (West 2011).)

27

28

because the Supreme Court expressly reserved deciding that issue in *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991). *See Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008); *Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006). Where there is no clearly established Supreme Court law, a state court's denial of a claim cannot be said to be contrary to or an unreasonable application of clearly established Supreme Court law. *See Carey v. Musladin*, 549 U.S. 70, 76-77 (2006). As the Ninth Circuit has noted:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, [citation omitted], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application."

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing *Williams*, 529 U.S. at 375 and *Musladin*, 549 U.S. at 77).

For the foregoing reasons, Phommachanh is not entitled to federal habeas corpus relief as to this claim. *Williams*, 529 U.S. at 412-13.

### 4. *Jury Instructions (claim three)*

Phommachanh contends the trial court erred when it refused to instruct the jury with CALCRIM No. 522 which states that provocation may reduce a murder from first degree to second degree. Specifically, Phommachanh argues that had the jury been so instructed, they could have concluded he was provoked by the confrontation between Sirypangno and the victim, Tylor Thompson, thus negating the premeditation and deliberation necessary to convict him of first degree murder. (Pet. at 27-30, ECF No. 1; Traverse at 32-41, ECF No. 29.) Respondent contends the state court's decision rejecting this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 19-21, ECF No. 9.)

Phommachanh raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 16) That court denied the petition without prejudice to any relief Phommachanh would have been entitled to under *People v.*

*Favor.* (*See* Lodgment No. 17.)  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis.  *Ylst*, 501 U.S. at 805-06.  That court wrote:

> CALCRIM No. 522 is a pinpoint instruction, and the trial court has no duty to give a pinpoint instruction sua sponte.  (*Rogers*, *supra*, 39 Cal.4th at pp. 878-879 [addressing CALJIC No. 8.73, the predecessor instruction to CALCRIM No. 522].)  Although Phommachanh did not directly request CALCRIM 522, he argues he did not forfeit this assignment of error because he relied upon the prosecutor to supply the court with a copy of the instruction.  The parties agree — and the record shows — provocation instructions were brought up during discussions between the court and counsel, and the court specifically asked the prosecutor to supply a copy of CALCRIM 522 "just in case."  In light of these circumstances, we will reach the substantive issue.

> What would otherwise be deliberate and premeditated first degree murder may be mitigated to second degree murder if the jury finds that the defendant "formed the intent to kill as a direct response to . . . provocation and . . . acted immediately, " i.e., without deliberation and premeditation.  (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, disapproved on other grounds in *People v. Burton* (1995) 12 Cal.4th 186, 200-201.)

> Provocation sufficient to mitigate a murder to second degree murder requires only a finding that the defendant's subjective mental state was such that he did not deliberate and premeditate before deciding to kill.  (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296.)  Thus, a defendant who is subjectively prevented from deliberating because of sufficient provocation is guilty of second degree murder rather than first degree murder, even if a reasonable person would not have been so precluded.  (*Id.* at pp. 1294-1296.)

> Absent an evidentiary basis, the court is not required to give CALCRIM No. 522.  (*People v. Ward* (2005) 36 Cal.4th 186, 215 [CALJIC No. 8.73, the predecessor instruction to CALCRIM No. 522].)  The only evidence of provocation by Thompson took place during the over-the-fence exchange between him and Sirypangno.  However, when Sirypangno, who was obviously agitated by the heated exchange, told Phommachanh about it, Phommachanh did not become agitated.  Rather, as related by the testimony of his cousin, Boualouang, Phommachanh told Sirypangno not to worry about it and tried to calm him down.  Moreover, Phommachanh left the scene, and, within minutes, returned after receiving a phone call asking him to do so.  Upon returning and before getting out of the car, Phommachanh put on a bandana to mask his face.  Donning a mask to hide one's identity is consistent with premeditation and deliberation; it is inconsistent with acting rashly.  (See *People v. Woods*, *supra*, 8 Cal.App.4th at p. 1595 [mask was evidence of planning, showing murder was premeditated and deliberate].)  Moreover, we note that when Phommachanh pointed the gun at Thompson, Thompson put his hand up and said "no."  When the gun did not fire at first, Phommachanh had the presence of mind to clear an unfired round from the chamber by racking back the slide of the gun and proceed with firing five shots.  These actions also were not consistent with acting on the basis of provocation.

Phommachanh has failed to show there was substantial evidence that he decided to kill Thompson in response to the alleged provocation, or that he killed Thompson "while in the grip of passion or any intense emotion" resulting from the alleged provocation. (*People v. Brown* (1981) 119 Cal.App.3d 116, 136.) The evidence[] does not support the inference that Phommachanh was overwhelmed with emotion or was provoked by what Thompson, as related by Sirypangno, did. Instead, the evidence supports the inference that Phommachanh, who had a gun in his possession, already had the intent to kill when he returned to the party site. Further, the evidence that he donned a make-shift mask to hide his face supports the inference that he planned and deliberated the murder before getting out of the car upon his return to the scene. In light of these factors, the trial court did not err by failing to instruct with CALCRIM No. 522. [FN26.]

> [FN26:] The fact that the trial court instructed on provocation/manslaughter (CALCRIM No. 570) does not change our decision. "'If the court through an abundance of caution, or neglect or mistake, gives partial instructions . . . when no such instructions are warranted, it should be ruled as a matter of law that all inquiry into the nature of the evidence on the issue is precluded . . . .'" (*People v. Frierson* (1979) 25 Cal.3d 142, 157.)

(Lodgment No. 12 at 51-53.)

"As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988), citing *Stevenson v. United States*, 162 U.S. 313 (1896). When determining whether error occurred, the Court must consider the jury instructions as a whole. *Id.* at 72. Jury instruction error is subject to harmless error analysis, that is, if error is found, relief can only be granted if it had a substantial and injurious effect on the jury's verdict. *California v. Roy*, 519 U.S. 2, 6 (1996); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

The state court's determination that there was insufficient evidence to warrant CALCRIM No. 522 was not unreasonable. Judy Rattana, Phommachanh's girlfriend, testified Sirypangno handed Phommachanh a gun as Phommachanh left the party with Rattana in a black Lexus; Phommachanh put the gun in the glove compartment. (Lodgment No. 5, vol. 18 at 3093.) When they left, Sirypangno was agitated and Phommachanh tried to calm him. (*Id.*) Shortly after Phommachanh left, Sirypangno called Phommachanh and Rattana and Phommachanh returned to the party. (*Id.* at

13cv0869

3096.) When they arrived back at the party, Phommachanh put a bandana over his nose and mouth, pulled the gun out of the glove compartment and got out of the car. (*Id.* at 3097-99.) Sirypangno was fighting in the front yard. (*Id.* at 3102.) Rattana then heard Phommachanh fire the gun more than five times. (*Id.* at 3102.)

Elexander Noble also testified he saw Sirypangno hand Phommachanh the gun as Phommachanh was leaving the party in the Lexus. (Lodgement No. 5, vol. 17 at 2794.) He further testified that when Rattana and Phommachanh returned to the party, he saw Phommachanh get out of the Lexus with a bandana covering the lower part of his face. (*Id.* at 2810.) Phommachanh and the other OKB members waited for Thompson to exit the party, then Sirypangno threw a punch at Thompson. (*Id.* at 2814-15.) Two other OKB members then jumped on Thompson. (*Id.* at 2816.) None of the OKB members called out for help, and no weapons were being used in the fight at that point. (*Id.*) Phommachanh then pulled the gun out, pointed it at Thompson and tried to fire it. (*Id.* at 2818, 2822-23.) The gun did not fire right away and appeared to be jammed or had the safety on. (*Id.* at 2822.) Phommachanh racked the slide back then fired the gun five times at Thompson and Anderson. (*Id.* at 2823.)

Danny Boualouang testified that as they were leaving the party, Sirypangno came out of the side gate of the house and looked upset. He also saw Phommachanh, who looked "normal." (Lodgment No. 5, vol. 16 at 2544.) A fistfight ensued between the victim, Tylor Thompson, Sirypangno, Steven Joyce, aka "Turtle" (another OKB member), and Thompson's friend, Brandon Guaderrama. (*Id.* at 2548-49.) No weapons or bottles were used during the fight until Phommachanh pulled a gun out of his waistband and began shooting. (*Id.* at 2551-52.) Boualouang also testified Phommachanh had a black rag over his nose and mouth. (*Id.* at 2562.)

Brandon Guaderrama testified he saw an Asian male yelling at the victim, Tylor Thompson, as he exited the party. (Lodgment No. 5, Vol. 22 at 3898.) The person swung a punch at Thompson, and Guaderrama threw a punch at Thompson's attacker. (*Id.* at 3900.) Four or five people then began assaulting Guaderrama. (*Id.* at 3901.) He

heard gunshots, got up, and ran away. (*Id.* at 3904.)

Jeremy Waller testified there was no fighting when he saw a black Lexus pull up in front of the house and Phommachanh get out of the car with a bandana on his face waving a gun around and saying "Who wants this?" and "We're going to do this shit." (Lodgment No. 5, vol. 22 at 3790.) Vincent Cagungun testified he saw a person get out of the black Lexus with a bandana on his face, and he appeared to have a gun. (*Id.* at 3858-59.)   Kelly Anderson, the second shooting victim, testified that when Phommachanh approached Thompson with the gun, Thompson said, "No," and put his hands out. (Lodgment No. 5, vol. 23 at 3965.)  On cross-examination, Anderson was confronted with her preliminary hearing testimony by defense counsel as follows:

> [MS. SUNDAY]: Now, you also described at the preliminary hearing, didn't you, that as you were lifting Tylor just before he was shot, that he made a move to hit the person, and then immediately pulled back and was defensive and said no? Do you recall that?
>
> A: That's incorrect.
>
> Q.  Okay.  Do you recall being asked this question, "You told us you had lifted, you were successful in lifting Tylor up, his torso up in front of you.  What happens next?"  And then answer, this is page 445, "After I lifted Tylor up, the gentleman that was approaching us coming from this way, which is now the third guy he was already in real close proximity to us.  So when Tylor came up he put his hand back as if to strike him, and then went no, and the hands came down in front?"
>
> A. I don't remember saying that.  But if it's in the transcript, it's probably what I said.

(Lodgment No. 5, vol. 23 at 3989-90.)

Phommachanh claims this testimony supports a provocation defense.  But in her preliminary hearing testimony as read by defense counsel, Anderson testified Thompson's hands came down before the first shot was fired.  (*Id.*)  And on re-direct examination, Anderson confirmed Thompson's arms were "bent at the elbow and the palms [were] facing outwards in an open shape."  (*Id.* at 4020.)[5]

---

[5]  At the preliminary hearing, Anderson testified that Thompson "but his hand back as if to strike [Phommachanh], and then he went no, and the hands came down in front *and then that's when the first gunshot went off.*" (Lodgment No. 4, vol. 3 at 445.)  Anderson also testified that Thompson's hands were "bent at the elbow. . . with her hands, her palms facing outward, with all 10 fingers raised."  (*Id.*)

As the state court correctly noted, there was not substantial evidence that Phommachanh was provoked.  Phommachanh himself was not involved in the fistfight.  The evidence did not establish Phommachanh's subjective mental state was such that he did not deliberate and premeditate before deciding to kill, *People v. Fitzpatrick*, 2 Cal. App. 4th 1285, 1295-96 (1992) or was afraid for his or his friends' safety.  There was no evidence anyone other than Phommachanh was armed.  There was evidence, however, negating provocation.  Phommachanh returned to the party after being called by Sirypangno who was upset after a perceived insult by Thompson to Sirypangno and OKB. Phommachanh, however, was not upset; rather, he seemed "normal." (Lodgment No. 5, vol. 16 at 2544.)  Phommachanh attempted to hide his identity by putting a bandana on his face before getting out of the car with the gun and waiting for the victim to leave the party.  Phommachanh then attempted to shoot the unarmed victim as the victim raised his hand defensively and said "no" while holding his hands up.  When the gun jammed, Phommachanh had the presence of mind to rack the slide back and chamber a new round, then shot at the victims five times as they ran away.  There is simply no substantial evidence that Phommachanh was provoked sufficient to warrant the CALCRIM No. 522 instruction.

In any event, any error did not have a substantial and injurious effect on the jury. *Brecht*, 507 U.S. at 637.  CALCRIM No. 522 permits a jury to find a defendant guilty of second degree murder, as opposed to first degree murder, if they conclude the defendant was provoked sufficiently such that defendant acted immediately upon being provoked and thus did not premeditate or deliberate. *People v. Wickersham*, 32 Cal. 3d 307, 329 (1982).  The jury's conclusion that Phommachanh was guilty of first degree murder, and its rejection of voluntary manslaughter/heat of passion, voluntary manslaughter/imperfect self defense, and defense of self or others, indicates the jury resolved the question of provocation against him.

In his Traverse, Phommachanh raises two other challenges to the jury

13cv0869

instructions, namely, that the failure to instruct with CALCRIM No. 522 impermissibly reduced the prosecution's burden of proof and the trial court's refusal to instruct the jury with CALCRIM No. 522 violated his Fifth Amendment right not to testify. (Traverse at 41-47, ECF No. 29.)  As this Court has already noted, "[a] Traverse is not the proper pleading to raise additional grounds for relief." *Cacoperdo*, 37 F.3d at 507. Additionally, this claim is not exhausted.  Nevertheless, this Court may deny the petition if it is "perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett*, 406 F.3d at 624.

The refusal to instruct the jury with CALCRIM No. 522 had no effect on the prosecution's burden of proof.  The prosecution was still required to prove every element of the crimes with which Phommachanh was accused beyond a reasonable doubt.  CALCRIM No. 522 would only have provided the jury with a theory of why the prosecution had not met that burden.  As discussed above, CALCRIM No. 522 was not warranted in this case.

Nor did the refusal to instruct with CALCRIM No. 522 violate Phommachanh's Fifth Amendment rights.  Phommachanh points to a statement by the trial judge in which he stated that CALCRIM No. 522 was not warranted because the jury had not heard anything about Phommachanh's beliefs which would support a provocation defense.  (*See* Traverse at 44, ECF No. 29.)  While testimony by Phommachanh is one way such evidence would have been placed before the jury, the defense could have presented circumstantial evidence of Phommachanh's beliefs as well.  Nothing in the trial judge's statement *required* Phommachanh to testify.

For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.  Phommachanh is not entitled to relief as to this claim.

### 5. *Sufficiency of Evidence as to the Gang Enhancements (claim four)*

Phommachanh contends there was insufficient evidence to support the gang allegations.  (Pet. at 31-40, ECF No. 1; Traverse at 48-60, ECF No. 29.)  Specifically,

he claims there was insufficient evidence to establish the crimes were committed for the benefit of a gang, and that he intended to promote, further or assist criminal conduct by the gang.  (Pet. at 31-40, ECF No. 1; Traverse at 48-60, ECF No. 29.)  Respondent counters that the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 21-23, ECF No. 9.)

Phommachanh raised this claim in his petition for review in the California Supreme Court.  (*See* Lodgment No. 15 at 19, Lodgment No. 16 at 19.)[6]  That court denied the petition without prejudice to any relief Phommachanh would be entitled to under *People v. Favor*.  (Lodgment No. 17; *see also* Footnote 3 of this Report and Recommendation.)  Accordingly, this Court must "look through" to the California appellate court's opinion denying the claim as the basis for its analysis.  *Ylst*, 501 U.S. at 805-06.  That court applied clearly established Supreme Court law in its analysis, namely, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  (*See* Lodgment No. 12 at 22.) In assessing a sufficiency of the evidence claim, the Supreme Court has stated that "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005), quoting *Jackson*, 443 U.S. at 319.   Even where the evidence supporting a conviction is circumstantial, this Court must presume the trier of fact resolved conflicting inferences in favor of the prosecution.  *Jackson*, 443 U.S. at 326.  In determining whether sufficient evidence has been presented, the Court must accept the elements of the crime as defined by state law.  *See Jackson*, 443 U.S. at 324, n. 16.  The state appellate court wrote:

> The prosecution may, as in this case, present expert testimony on criminal street gangs to prove the elements of the criminal street gang enhancement.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-48;

⁶ As Respondent notes, Sirypangno raised this claim in his petition for review, and Phommachanh joined in Sirypangno's arguments. (*See* Lodgment No. 15 at 19, Lodgment No. 16 at 19.)

13cv0869

*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322; *People v. Gardeley* (1996) 14 Cal.4th 605, 617-620 (*Gardeley*).) "[E]xpert testimony about gang culture and habits is the type of [circumstantial] evidence a jury may rely on to reach . . . a finding on a gang allegation." (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930 (*Ferraez*).) Permissible expert testimony includes the size, composition or existence of the gang, the gang's turf or territory, an individual defendant's membership in the gang, the primary activities of the gang, whether or how the crime was committed to benefit or promote the gang, and motivation for a particular crime. (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512-1514.)

With respect to the gang benefit element of section 186.22, subdivision (b)(1), Detective Hatfield, the prosecution's gang expert, testified that gangs gain what they deem as respect by committing violent crimes against general members of the community as well as against members of rival gangs. In his general testimony about gangs, Hatfield also said acts of disrespect to a gang or gang member are not left unanswered. An act of disrespect to an individual gang member is considered an act of disrespect to the gang. Verbal insults can constitute an act of disrespect, and such verbal exchanges often escalate into violent confrontations. Fellow gang members typically provide backup to a disrespected gang member.

The gang detective also testified it is not unusual for a gang member to get into a physical fight with someone who had verbally disrespected him — even if the person had no gang ties — and for the fight to lead to someone being shot to death. Hatfield said that such a scenario would benefit the gang because it would enhance the gang's reputation for violence and increase the level of fear and intimidation the gang has in the community.

Significantly, Hatfield's expert testimony provided context to the jury about Sirypangno's and Thompson's heated over-the-fence exchange. Specifically, the jury heard evidence that Sirypangno believed Thompson had called OKB members "bitches" and the exchange concluded with Thompson saying "suck my dick," and Sirypangno throwing a wood plank over the fence and suggesting that he would physically confront Thompson soon.

Afterward, Sirypangno told Phommachanh about the exchange and waited outside for Thompson to leave the backyard. As we waited for Thompson, Sirypangno asked a friend to phone Phommachanh, who had left, to return. Upon returning, Phommachanh donned a mask, retrieved the gun from the glove compartment, waved the gun after exiting the car and shouted "who wants it." Phommachanh then joined Sirypangno, Joyce and Giraud, who were lined up in front of the house waiting for Thompson to emerge from the backyard. When Thompson emerged, Sirypangno approached him and said "you the fool who told me to suck your dick," thereby informing Phommachanh who was the target.

The jury could also consider an earlier incident at the party when Sirypangno and Phommachanh were asked to leave. Sirypangno responded by brandishing the gun and saying: "This is OKB." Phommachanh's response was to flash gang hand signs.

28

13cv0869

The totality of the evidence was legally sufficient for the jury to conclude that Phommachanh and Sirypangno committed the crimes "for the benefit of, at the direction of, or in association with [a] criminal street gang." (§ 186.22, subd. (b)(1).) Under existing case law, the fact that Phommachanh perpetrated the crimes in the company of fellow gang members supports an inference that the crimes were committed for the benefit of or in association with the gang. (See *People v. Miranda*, *supra*, 192 Cal.App.4th at pp. 412-413 [commission of crime accompanied by gang members supports inference defendant intended to benefit gang]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*) [commission of crime with fellow gang members support inference crime was committed in association with gang].) The fact that Phommachanh killed Thompson and committed the other crimes in front of witnesses after Thompson insulted fellow gang member Sirypangno also supports an inference these crimes were committed for the benefit of the OKB gang. Case law recognizes that "[a] community cowed by gang intimidation is less likely to report gang crimes and to assist in their prosecution. The gang benefit is plain." (*People v. Margarejo* (2008) 162 Cal.App.4th 102, 110; see also *Gardeley*, *supra*, 14 Cal.4th at p. 619 [expert testimony that crimes committed by gang member were committed to instill fear in community sufficient to support gang enhancement allegations]; *Ferraez*, *supra*, 112 Cal.App.4th at p. 931 [finding substantial evidence supported gang enhancement when expert opinion was couple[d] with other testimony from which jury could reasonably infer crime was gang related].)

Sirypangno maintains the assault on Thompson was committed for a personal reason — a verbal argument between him and Thompson — and not to benefit OKB. Sirypangno claims he was personally insulted by Thompson's "suck his dick" comment; this was the impetus for the fight — not gang-related issues, such as gang territory or past grievances with a rival gang. Relying on Thompson's lack of gang membership and the absence of gang signs and other manifestations of the OKB gang, [FN12] Sirypangno urges that the most the prosecution showed was a possibility that the crimes were for the benefit of the gang. We disagree.

FN12. Although there was no calling out of "OKB" and no flashing of gang hand signals during the fatal confrontation with Thompson, Sirypangno had shouted, "This is OKB," and Phommachanh had flashed hand signals when they were confronted by Farhan and others earlier that evening.

To be sure, "[n]ot every crime committed by gang members is related to a gang . . . ." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) Further, "it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang." (*Morales*, *supra*, 112 Cal.App.4th at p. 1198.) However, the issue before us is not whether there was evidence from which the jury could have concluded the murder and other crimes were personal rather than gang related. Rather the issue is whether the jury was presented with evidence that was reasonable, credible and of solid value from which a reasonable trier of fact could find the enhancement was true beyond a reasonable doubt. Here, the jury heard such evidence. Ultimately it was for the jury to resolve any evidentiary disputes, and we have no power to reweigh the evidence, make credibility calls or substitute our conclusion

13cv0869

for the jury's.  (*Albillar*, *supra*, at p. 60; *Ferraez*, *supra*, 112 Cal.App.4th at p. 931.)

Sirypangno's reliance on *People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*), *People v. Ramon* (2009) 175 Cal.App.4th 843, 851 (*Ramon*) and *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*) is misplaced.

*Ochoa*, *supra*, 179 Cal.App.4th 650, in which the Court of Appeal reversed true findings on gang allegations in connection with the defendant's conviction for carjacking and being a felon in possession of a firearm, is distinguishable.  The defendant was not accompanied by fellow gang members; he acted alone.  (*Id.* at p. 662.)  Further, there was no evidence of gang names, gang signals or other manifestations typically associated with gangs.  (*Ibid.*)  The appellate court observed that "[a] gang expert's testimony alone is insufficient to find an offense gang related" and that the "'record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang.' [Citation.]"  (*Id.* at p. 657, italics omitted.)

*Ramon*, *supra*, 175 Cal.App.4th 843, is similarly distinguishable because that case involved the propriety and sufficiency of expert testimony where there is no supporting evidence.  In *Ramon*, officers stopped the defendant, a conceded gang member, while he was driving a stolen vehicle within his gang's territory with a fellow gang member.  (*Id.* at p. 847.)  Inside the vehicle was a loaded, unregistered firearm under the driver's seat.  The defendant was charged with receiving a stolen vehicle, being a felon in possession of a firearm and carrying a loaded firearm in public for which he was not a registered owner and corresponding gang enhancements.  The jury convicted the defendant and found the gang allegations to be true.  (*Id.* at pp. 847–848.) The appellate court vacated the gang enhancements, concluding there was insufficient foundation for the expert's opinions:

"The People's expert simply informed the jury of how he felt the case should be resolved.  This was an improper opinion and could not provide substantial evidence to support the jury's finding.  There were no facts from which the expert could discern whether [the defendant and his companion] were acting on their own behalf the night they were arrested or were acting on behalf of [their gang].  While it is possible the two were acting for the benefit of the gang, a mere possibility is nothing more than speculation.  Speculation is not substantial evidence." (*Id.* at p. 851.)

Unlike *Ochoa*, *supra*, 179 Cal.App.4th 650 and *Ramon*, *supra*, 175 Cal.App.4th 843, here the expert's testimony was not the only evidence that the offenses were gang related.

*Albarran*, *supra*, 149 Cal.App.4th 214 is not helpful to Sirypangno and Phommachanh.  The Court of Appeal in *Albarran* did not consider whether there was sufficient evidence to support gang enhancement allegations, but rather, whether gang evidence was admissible with respect

to the underlying offenses at issue in that case. (*Id.* at pp. 222–223.)  The fact that crimes in *Albarran* occurred at a birthday party is of no significance.

As to the second element of section 186.22, subdivision (b)(1) — the specific intent issue — Sirypangno again relies on evidence that the initial assault on Thompson was personal and argues the prosecution showed no more than the possibility that he had the requisite specific intent to promote, further, or assist in gang crime.  As explained above, we reject Sirypangno's restrictive view of the evidence.

Sirypangno's second argument concerning the lack of the requisite specific intent is that there was no evidence showing the crimes furthered some other criminal conduct by OKB.

The problem with Sirypangno's argument is that he has misread or misconstrued the statute.  Section 186.22, subdivision (b)(1) does not require the specific intent to further some other criminal conduct by the gang; "[w]hat is required is the 'specific intent to promote, further, or assist in any criminal conduct by gang members . . . .' " (*Morales, supra*, 112 Cal.App.4th at p. 1198, italics added.)  The overwhelming majority of decisions by Courts of Appeal throughout the state have subscribed to this interpretation of the statute — namely section 186.22, subdivision (b)(1) requires the specific intent to aid *any* criminal activity by gang members. (See, e.g., *People v. Villalobos* (2006) 145 Cal.App.4th, 310, 322 (*Villalobos*); *People v. Romero* (2006) 140 Cal.App.4th 15, 19–20; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332; *People v. Leon* (2008) 161 Cal.App.4th 149, 163.)

Sirypangno, on the other hand, principally relies on two federal opinions by the Ninth Circuit Court of Appeals (*Garcia v. Carey* (9th Cir.2005) 395 F.3d 1099 and *Briceno v. Scribner* (9th Cir.2009) 555 F.3d 1069), which have now been repudiated by our Supreme Court in *Albillar*, *supra*, 51 Cal.4th 47, 65–66.) [footnote 13 omitted.]

In *Garcia v. Carey*, *supra*, 395 F.3d at page 1101 and *Briceno v. Scribner*, *supra*, 555 F.3d at page 1079, divided panels of the Ninth Circuit held section 186.22, subdivision (b)(1) requires evidence that a defendant had the specific intent to further or facilitate *other* criminal conduct, i.e., "other criminal activity of the gang apart" from the offenses for which the defendant was convicted.

In *Albillar*, *supra*, 51 Cal.4th at page 66, the state's high court rejected this interpretation of the statute by the Ninth Circuit and adopted the one set forth by the majority of appellate courts in the state. "[T]he scienter requirement in section 186.22, [subdivision] (b)(1)—i.e., 'the specific intent to promote, further or assist in any criminal conduct by gang members' — is unambiguous and applies to any criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar*, *supra*, at p. 66.)  We, of course, are bound by the *Albillar* conclusion.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

As to the argument that section 186.22, subdivision (b)(1) requires the specific intent to promote, further, or assist a gang-related crime, the *Albillar* court observed:

> "The enhancement already requires proof that the defendant commit a gang-related crime in the first prong — i.e., that the defendant be convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang. [Citation.] There is no further requirement that the defendant act with the specific intent to promote, further, or assist a gang; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Albillar*, *supra*, 51 Cal.4th at p. 67; original italics.)

In other words, section 186.22, subdivision (b)(1) "applies when a defendant has personally committed a gang-related felony with specific intent to aid members of that gang." (*Albillar*, *supra*, at p. 68.)

With the law now settled, "[c]ommission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime." (*Villalobos*, *supra*, 145 Cal.App.4th at p. 322.)

We conclude there is substantial evidence that Sirypangno and Phommachanh had the requisite specific intent to promote, further and assist criminal conduct by gang members. Sirypangno and Phommachanh were OKB gang members attending a party where their very presence was questioned earlier that evening, leading them to jump over the backyard fence. Although no violence erupted during that incident, Sirypangno called out "OKB" and Phommachanh flashed gang hand signs. Later, Sirypangno believed he heard Thompson insult him ("suck my dick") and his gang (the "bitches" remark). Sirypangno informed Phommachanh of the over-the-fence exchange. Also, Sirypangno gave Phommachanh the firearm before Phommachanh left the party. Sirypangno then waited outside for Thompson to emerge from the backyard. A reasonable inference was that Sirypangno told Phommachanh about the insults to secure gang backup for his ensuing fight with Thompson. Another reasonable inference was that Phommachanh planned to return to the party with the firearm to provide the backup. Detective Hatfield, the prosecution's gang expert, testified that respect toward gang members is paramount in gang culture and gang members do not leave insults unanswered. Verbal insults can constitute an act of disrespect, and such verbal exchanges often escalate into violent confrontations. Fellow gang members typically provide backup to a gang member, who has been disrespected. Hatfield also testified that violent crimes benefit gangs because as news of their crimes is spread in the community, the level of public fear and intimidation increases. "Expert opinion that particular criminal conduct benefitted a gang by enhancing its reputation . . . can be sufficient to raise the inference that the conduct was 'was committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22, [subdivision] (b)(1)." (*Albillar*, *supra*, 51 Cal.4th at p. 63.) A jury could have reasonably concluded that in committing the charged crimes, Sirypangno and Phommachanh acted with the requisite specific

13cv0869

1
2
3
4
5

intent — namely, "to promote, further or assist gang members in the commission of the crime." (*Villalobos*, *supra*, 145 Cal.App.4th at p. 322.) The jury reasonably could have inferred that Sirypangno and Phommachanh acted "with the specific intent to promote, further, or assist in any criminal conduct by [fellow] gang members." (§ 186.22, subd. (b)(1).)  The fact that Sirypangno was personally insulted by Thompson did not remove the case from application of section 186.22, subdivision (b)(1). [footnote 14 omitted.]

6

(Lodgment No. 12 at 22-32.)

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

As the state court noted, "[t]o subject a defendant to a gang enhancement (§ 186.22(b)(1)), the prosecution must prove the underlying crime was 'committed for the benefit of, at the direction of, or in association with any criminal street gang' (the gang-related prong), 'with the specific intent to promote, further, or assist in any criminal conduct by gang members' (the specific intent prong)." *People v. Rios*, 222 Cal. App. 4th 542, 705 (2013) (quoting Cal. Penal Code § 186.22, subd. (b)(1) and citing *People v. Albillar*, 51 Cal.4th 47, 59-60 (2010).)[7] "Expert opinion that particular criminal conduct benefitted a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of ... a [ ] criminal street gang' within the meaning of section 186.22(b)(1)." *Albillar*, 51 Cal. 4th at 63.  Such expert opinion was present in this case.  Detective Hatfield testified that in his expert opinion, Phommachanh and Sirypangno were members of OKB. (Lodgment No. 5, vol. 26 at 4620-23.)  Other, independent evidence established this as well.  (*See* Lodgment No. 5, vol. 16 at 2526; vol. 17 at 2770; vol. 18 at 3054, 3061.) OKB was documented as a criminal street gang in 1994, and members had committed many crimes, including witness intimidation, drug offenses, burglaries, auto thefts, batteries, assaults, beatings, stabbings, shootings, and murders.  (Lodgment No. 5, vol. 26 at 4543, 4551.)  Specifically, Hatfield testified OKB members had been prosecuted for gang related crimes in 2004, 2003, and 2002.  (*Id.* at 4563-68.)

26

Hatfield also testified that in addition to Phommachanh and Sirypangno, several

27
28

[7] Phommachanh does not challenge the other requirements of the statute.  *See* Cal. Penal Code section 186(e) and (f); *People v. Gardeley*, 14 Cal. 4th 605, 616-17 (1996).

other OKB gang members or associates were at the scene of the crime — Steven Joyce, Devin Giraud, Judy Rattana and Julie Nguyen — who either participated in the physical altercation with the victim, Thompson, threatened party-goes with retaliation by OKB, or assisted in Phommachanh's and Sirypangno's getaway from the scene. (*Id.* at 4568-87.) According to Hatfield, gang members gain respect from fellow gang members and move ahead in a gang by "committing crimes, especially crimes of violence against other individuals, whether it be your rivals or whether it be just anybody in general." (*Id.* at 4538.) Committing crimes shows you are "tough enough, backing your gang set . . . because if you get disrespected, the gang can get disrespected." (*Id.* at 4539.) Calling a gang member a name is an act of disrespect. (*Id.* at 4540.) If a gang member shot and killed someone, he would gain respect within the gang, and the gang itself would benefit by being more well known and feared. (*Id.* at 4623.) Applying the *Jackson* standard, this is sufficient evidence for a reasonable jury to conclude that the crimes committed by Phommachanh were for the benefit of OKB. *Jackson*, 443 U.S. at 319.

There was also sufficient evidence to support the jury's conclusion that Phommachanh committed the crimes with the specific intent to promote, further, or assist in any criminal conduct by gang members. Evidence was presented that on the way to the Mira Mesa party, Phommachanh told someone who called him on his phone to bring a "strap" (gang jargon for a gun) to the party because there might be some problems there. (Lodgment No. 5, vol. 16 at 2525.) When Phommachanh, Sirypangno and other OKB members Steven Joyce and Devin Giraud arrived at the Mira Mesa party, they were challenged by individuals who were monitoring entrance into the party. Phommachanh said that if they were not let in, there would be trouble. (*Id.* at 2536.) Rattana also told the people manning the entrance to the party "not to mess with these guys." (*Id.* at 2537.)

Once inside, an OKB associate, Mai threatened to have a party attendee "jumped" by OKB as reprisal for blowing smoke in her face. (Lodgment No. 5, vol. 20 at 3397-

99; vol. 21 at 3535.)   After making party guests uncomfortable, Phommachanh, Sirypangno and their friends were asked to leave; in response, Sirypangno displayed a gun, pointed it at a party guest, and Phommachanh flashed an OKB sign, saying "This is OKB." (Lodgment No. 5, vol. 19 at 3140-41.)  Mai also later shouted OKB during an altercation with Natasha Richardson.   (Lodgment No. 5,   vol. 21 at 3553-54.) Phommachanh and Sirypangno jumped over the fence and out of the yard, but Sirypangno lingered outside the fence and thought he heard the victim Thompson insult him and OKB by calling them "bitches." (Lodgment No. 5, vol. 17 at 2787-88.)  An argument between Sirypangno and Thompson ensued, with Thompson eventually telling Sirypangno to "suck my dick." (*Id.* at 2788-90, vol. 22 at 3777-83; vol. 23 at 3949-50.)  As Phommachanh was leaving, Sirypangno told him about Thompson's insults; Phommachanh tried to calm Sirypangno down, then left. (Lodgment No. 5, vol. 16 at 2544; vol. 17 at 2791-94.) As Phommachanh was leaving, Sirypangno passed him a gun. (*Id.* at 2794.)  Within five minutes of leaving, Phommachanh received a phone call and returned to pick up Sirypangno. (*Id.* at 2795; vol. 18 at 3093, 3096.)  Upon returning to the party, Phommachanh exited the car with a bandana on his face and a gun in his hand and shot the victims. (Lodgment No. 5, vol. 17 at 2818-28; vol. 18 at 3097-3102; vol. 23 at 3965-69.)  Following the shootings, Phommachanh enlisted fellow gang members to help him cover up the crime.  He hid the gun in fellow OKB member Devin Giraud's house. (Lodgment No. 5, vol. 16 at 2572-73.)  Phommachanh then told Rattana to put Danny Boulaloung's bloody clothes in a bag and that OKB "homies" would pick it up. (Lodgment No. 5, vol. 16 at 2577; vol. 18 at 3106, 3109-10; vol. 19 at 3155-56.)

A reasonable jury could conclude from this evidence, and the expert testimony of Hatfield, that Phommachanh intended promote, further or assist conduct by OKB. As the California Supreme Court has noted:

> The enhancement already requires proof that the defendant committed a gang-related crime in the first prong — i.e., that the defendant be convicted of a felony committed for the benefit of, at the direction of, or

in association with a criminal street gang. [citation omitted]. There is no further requirement that the defendant act with the specific intent to promote, further, or assist a gang; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*.

*Albillar*, 51 Cal. 4th at 67.

Applying this standard, a reasonable jury could have concluded that Phommachanh intended to shoot the victims because Thompson had disrespected Sirypangno, a fellow OKB member, and the OKB gang itself. As Hatfield testified, gang members commit crimes when a gang member is disrespected "because if you get disrespected, the gang can get disrespected," and that calling a gang member a name is an act of disrespect. (Lodgment No. 5, vol. 26 at 4539-40.) Shooting a person who disrespected the gang or gang members benefits the gang by increasing its notoriety and fear of the gang. (*Id.* at 4623.) Thus, the jury could have concluded that by shooting the victims, one of whom had disrespected an OKB member (Sirypangno), where onlookers would witness the violence, Phommachanh intended to promote OKB's reputation for violence, show that OKB members would not tolerate perceived disrespect of the gang or gang members, and instill fear in community members.

For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. Phommachanh is not entitled to relief as to this claim.

6. *Evidentiary Hearing*

On page 62 of Phommachanh's Traverse, he asks this Court to conduct an evidentiary hearing on his claims. (Traverse at 62, ECF No. 29.) Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999) The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

(A) the claim relies on –

1        (i) a new rule of constitutional law, made retroactive
2        to cases on collateral review by the Supreme Court, that was previously unavailable; or

3        (ii) a factual predicate that could not have been
4        previously discovered through the exercise of due diligence; and

5       (B) the facts underlying the claim would be sufficient to establish
6       by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

7

8    28 U.S.C.A. § 2254(e)(2) (West 2006).

9       In order to determine whether to grant an evidentiary hearing, the court must first
10   "determine whether a factual basis exists in the record to support the petitioner's claim."
11   *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (citing *Baja*, 187 F.3d at
12   1078).  If not, the court must "ascertain whether the petitioner has 'failed to develop the
13   factual basis of the claim in State court.'"  *Id.* at 669-70.  A failure to develop the
14   factual basis of a claim in state court implies "some lack of diligence, or some greater
15   fault, attributable to the prisoner or the prisoner's counsel." *See Williams v. Taylor*, 529
16   U.S. 420, 432 (2000).  The Supreme Court has said that "[d]iligence will require in the
17   usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in
18   the manner prescribed by state law." *Id.* at 437.

19       Pursuant to *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388, 1402 (2011),
20   Phommachanh is limited to the facts presented to the state court.  In *Pinholster*, the
21   Supreme Court held that where habeas claims have been decided on their merits in state
22   court, a federal court's review must be confined to the record that was before the state
23   court. *Id.* at 1398. Phommachanh can only proceed to develop additional evidence in
24   federal court if either § 2254(d)(1) or (d)(2) is first satisfied. *See Sully v. Ayers*, __ F.3d
25   __, No. 2013 WL 3988674 at *14 (9th Cir. Aug. 6, 2013) (stating that "an evidentiary
26   hearing is pointless once the district court has determined that § 2254(d) precludes
27   habeas relief" and citing *Pinholster*, 131 S.Ct. at 1411, n. 20).  It has not been here for
28   all the reasons discussed above. Accordingly, the Court recommends Phommachanh's

1   request for an evidentiary hearing be **DENIED**.

2   **V.    CONCLUSION**

3       The Court submits this Report and Recommendation to United States District

4   Judge Michael M. Anello under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d)(4)

5   of the United States District Court for the Southern District of California. For the

6   reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an

7   order: (1) approving and adopting this Report and Recommendation, and (2) directing

8   that Judgment be entered **DENYING** the request for an evidentiary hearing and

9   **DENYING** Petition for Writ of Habeas Corpus.

10      **IT IS ORDERED** that no later than **May 30, 2014** any party to this action may

11  file written objections with the Court and serve a copy on all parties. The document

12  should be captioned "Objections to Report and Recommendation."

13      **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with

14  the Court and served on all parties no later than **June 13, 2014**.  The parties are advised

15  that failure to file objections within the specified time may waive the right to raise those

16  objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th

17  Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

18      **IT IS SO ORDERED.**

19  **DATED:  May 9, 2014**

21                          **Hon. Mitchell D. Dembin**
22                          **U.S. Magistrate Judge**

38